NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

JAMES EARL JACKSON,

        **Plaintiff,**

v.                                         **Case No. 6:16-cv-602-Orl-37KRS**

COMMISSIONER OF SOCIAL
SECURITY,

        **Defendant.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT:**

This cause came on for consideration without oral argument on the Complaint filed by

Plaintiff, James Earl Jackson, seeking review of the final decision of the Commissioner of Social

Security denying his claim for social security benefits, Doc. No. 1, the answer and certified copy

of the record before the Social Security Administration ("SSA"), Doc. Nos. 8, 10, and the parties'

Joint Memorandum,[1] Doc. No. 19.

---

[1] I required counsel for the parties to submit a single, Joint Memorandum with an agreed statement of the pertinent facts in the record.  Doc. No. 11.  Counsel for Plaintiff was ordered to identify and frame, in a neutral fashion, each of the disputed issues raised as grounds for reversal and/or remand, and counsel for the Commissioner was required to respond to each of those issues in the format set forth in the Scheduling Order.  *Id.* at 4.

NOT FOR PUBLICATION

## PROCEDURAL HISTORY.

In 2010, Jackson filed an application for benefits under the Federal Old Age, Survivors and Disability Insurance Programs ("OASDI"), 42 U.S.C. § 401, *et seq.*    He alleged that he became disabled on May 11, 2010.   R. 126.

After his application was denied originally, on reconsideration, by an Administrative Law Judge ("ALJ"), and by the Appeals Council, Jackson sought review of the Commissioner's final decision by this Court.   The Commissioner agreed to reversal of the decision and remand for further proceedings. R. 547-48.   The Court granted the Commissioner's request, reversed the original decision pursuant to sentence four of 42 U.S.C. § 406(g) and remanded the case for further proceedings.   R. 545-46.   On remand, the Appeals Council vacated the prior decision and remanded the case to an ALJ to take specific action, including to "[e]valuate all opinions, including consultative examiners and State agency consultants, . . . and explain the weight given to such opinion evidence."   R. 555-56.   After the case was remanded, Jackson filed a new OASDI disability application.   The Appeals Council directed that this application be consolidated with the original application for further action on remand.   R. 556.

On remand, an ALJ held a hearing on December 22, 2015.   Jackson (accompanied by an attorney), medical experts ("ME") Richard Anderson, Ph.D., and Frank Barnes, M.D., and vocational expert ("VE") C. Kimball Heartsill testified at the hearing.   R. 468-31, 678.

After considering the hearing testimony and the evidence in the record, the ALJ found that Jackson was insured under OASDI through December 31, 2015.   The ALJ concluded that Jackson had not engaged in substantial gainful activity since the alleged disability onset date.   R. 444.

2

NOT FOR PUBLICATION

The ALJ found that Jackson had degenerative disc disease, osteoarthritis, a history of gout, obesity, hypertension and kidney disease, which were severe impairments.  *Id.*  The ALJ found that Jackson's mental impairment was not severe, giving great weight to the opinion of Lisa Merilson, Psy.D., and ME Anderson and little weight to treatment notes from Coastal Mental Health Center.  R. 445-46, 448-49.   The ALJ concluded that Jackson's impairments, individually and in combination, did not meet or equal a listed impairment.   R. 449.

The ALJ determined that Jackson had the residual functional capacity ("RFC") to perform sedentary work as follows:

> [Claimant can] sit for 6 to 8 hours total, an hour or two at a time; standing and walking are limited to 2 hours total, at 30-minute intervals. The claimant could lift and carry 10 pounds occasionally and 5 pounds frequently; occasionally bend, stoop, and kneel; occasional climbing stairs and ramps; no climbing ropes, ladders, and scaffolds; no restrictions on the use of the upper extremities; occasional foot controls; occasional exposure to vibration, hazards, and/or cold; no restrictions on feeling, fingering, handling, pushing, and pulling with the hands.

R. 451.   In making this determination, the ALJ gave little weight to a functional capacity assessment prepared by Youssef Guergues, M.D., in August 2015.   R. 455.   The ALJ gave great weight to the opinions of ME Barnes.   R. 456.   The ALJ did not discuss or state the weight he afforded to opinions of Charles Kollmer, M.D., and Vinod Malik, M.D.

The ALJ concluded that Jackson could not return to his past relevant work as an electrician's helper, fiberglass laminator or finisher fiberglass boat parts.  *Id.*   Based on the testimony of the VE, the ALJ found that there were sedentary, unskilled jobs available in the national economy that Jackson could perform.   R. 457-58. Therefore, the ALJ found that Jackson was not disabled.  *Id.*

3

Jackson now seeks review of the final decision of the Commissioner by this Court.

## JURISDICTION AND STANDARD OF REVIEW.

Jackson having exhausted his administrative remedies, the Court has jurisdiction to review the decision of the Commissioner pursuant to 42 U.S.C. § 405(g).   A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (per curiam), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

## SUMMARY OF THE FACTS.

After a thorough review of the record, I find that the facts are somewhat adequately stated in the parties' Joint Memorandum, which statement of facts I incorporate by reference. Accordingly, I will only summarize facts relevant to the issues raised to protect Jackson's privacy to the extent possible.

Jackson was born in 1968.   He attended school through the seventh or eighth grade.   R. 32, 475-76.   He could not read well.   R. 52.    Jackson previously worked at medium exertional jobs, specifically as an electrician's helper and in the boat building business.   R. 57.   In early 2010, Jackson had a workers' compensation injury.   R. 246.   He received unemployment compensation beginning in 2010.   R. 518.

Jackson was involved in a motor vehicle accident in May 2010.   R. 32.   At the original ALJ's hearing in September 2012, Jackson reported that he had severe back pain radiating into his legs with numbness.   When he took medication he was "like in the zombie mood."   R. 45.   He also had occasional problems with his right knee.   R. 50.   He had fallen a number of times.   R.

51.   He did not do any inside or outside household chores.   R. 45-46.   Jackson estimated that he could sit 20 to 30 minutes due to back pain.   R. 46-47.   On a good day, he could stand 15 to 20 minutes.   R. 48.   He could walk about 15 yards.   *Id.*   Pain interfered with his ability to concentrate and socialize.   R. 51-52.

During the hearing after remand held in 2015, Jackson estimated his pain as 8 or 9 on a 10-point pain scale.   Pain interfered with his ability to concentrate.   R. 512.   Due to pain, he spent his days lying down after taking medication.   R. 515.

*Relevant Physical Impairments.*

The medical records regarding Jackson's physical impairments reflect that Jackson sought treatment from Charles E. Kollmer, M.D., in June 2010, after the May 2010 automobile accident. Jackson complained of back and neck pain and numbness and tingling in his right hand and fingers and low back.   R. 246.   Upon examination, Dr. Kollmer observed a positive Tinel's test, positive median nerve compression test, and positive Phalen's test in Jackson's right arm and hand.   R. 247.   He also noted tenderness and paraspinal muscle spasm with a positive straight-leg raising test.   R. 247-48.   His impressions were cervical strain; lumbosacral strain with minimal degenerative changes, spondylosis and sciatica to the right side; and carpal tunnel syndrome, right side.   He prescribed medication and ordered further testing.   R. 249-50.   During a follow-up appointment on July 12, 2010, Dr. Kollmer stated that Jackson "should remain out of work at this time."   R. 244.   Subsequent EMG testing of the legs was within normal limits.   R. 240.   Dr. Kollmer recommended further evaluation and carpal tunnel release surgery on the right. R. 240-41.

5

Jackson sought treatment from Anne I. Dunham, M.D, due to back and leg pain and problems with his arm.   On September 17, 2010 Dr. Dunham observed that Jackson wore a right wrist brace and used a cane.   He had difficulty getting out of the exam chair and walked with an antalgic gait.   Although Jackson reported that Oxycodone was not effective in relieving his pain, Dr. Dunham noted that Jackson reported none of the pain medications she prescribed were particularly satisfactory in relieving his pain.   Accordingly, she prescribed Oxycodone and Soma. R. 336.

On March 9, 2011, Alvan W. Barber, M.D., examined Jackson at the request of the State Office of Disability Determinations.   Dr. Barber noted that Jackson used a right wrist support and walked with a slow and guarded gait using a cane.   Upon examination, he observed a positive Tinel's sign on the right and positive tenderness and spasm in the area of the spine.   Dr. Barber opined that Jackson could not walk or stand for long periods of time, but he could sit for reasonable periods of time.   He could not walk long distances without a cane.   R. 340-47.

On February 17, 2012, Jackson sought treatment from Dr. Guergues for complaints of radiating cervical pain and radiating lumbar back pain with right leg numbness.   R. 397.   Dr. Guergues observed that Jackson had a normal gait.   R. 398.   A straight-leg raising test was positive on the right, and tenderness to palpation was noted in the lumbar spine.   Range of motion was mildly limited.   *Id.*   Dr. Guergues' impressions were lumbago/low back pain; radiculitis, thoracic/lumbar/lumbosacral; sciatica/SI joint neuralgia; and disc displacement/HNP w/o myelopathy, lumbar, noting a disc bulge a L4-5.   He prescribed Tramadol and scheduled caudal epidural steroid injections.   R. 399.   The injections were administered in February and March 2012, but they provided Jackson no relief.   R. 386-95.

6

NOT FOR PUBLICATION

In May 2012, Dr. Guergues administered bilateral facet injections.   He noted that Jackson had a normal gait.   R. 383-85.   From September 2012 through February 2013, Dr. Guergues administered bilateral L4-S1 chemical rhizotomies.   R. 768-84, 973.   Once again, Dr. Guergues noted that Jackson had a normal gait.   R. 972.     Dr. Guergues administered additional caudal epidural steroid injections from May through July 2013, and additional L4-S1 facet joint injections in October and November 2013.   R. 750-61, 803-06.   He administered another L4-5 and L5-S1 chemical rhizotomy in February 2014.   R. 803-06.

In 2014, Jackson sought treatment from Dr. Malik and ARNP Lorrie Kenseth for lower back, shoulder, right leg and right hand pain.   R. 794.   Upon examination, severe tenderness in the lumbosacral spine with a positive straight-leg raising test and moderate limitation in range of motion were observed.   The diagnoses were lumbago/low back pain; radiculitis, thoracic/lumbar/lumbosacral; and cervical pain/cervicalgia.   R. 795.   Robaxin and Percocet were prescribed.   R. 796.

Jackson returned to Dr. Guergues' office in September 2014, when he was examined by Kavita Sharma, D.O.   Jackson reported that MS Contin, Percocet and Robaxin were not effective in relieving his pain.   Upon examination, Dr. Sharma observed severe tenderness in the lumbosacral area, a positive straight-leg raising test and moderate limitation in range of motion. She continued his narcotic pain medication.   R. 1010-12.   Dr. Guergues continued to treat Jackson, including administering caudal epidural steroid injections, through February 2015.   R. 1008, 1087-1102.

On March 3, 2015, John Parnell, M.D., wrote that he had provided Jackson with a walking cane, which was medically necessary, and indicated that Jackson should be permitted to carry it

with him at all times.   R. 1021.   Dr. Parnell appears to have been Jackson's primary care physician.

On June 30, 2015, Jackson returned to Dr. Malik.   Upon examination, severe tenderness was observed in the lumbosacral region with a positive straight-leg raising test and moderate limitation in range of motion.   R. 1077.   Dr. Malik scheduled a spinal cord stimulator trial, writing as follows:

> James Jackson has suffered from chronic disabling pain which has caused psychological, social and physical impairment.   The patient has tried unsuccessfully to have this pain relieved using conservative treatment for pain management.   An attempt to alleviate the pain with less invasive treatment has not been successful.   Radiological findings and my evaluations are consistent with the pre-op diagnosis supporting the procedure.   It is medically necessary that the patient undergoes an interventional pain management procedure to ease the painful syndrome, improve psychological status, return to functional quality of life and if applicable return to work.

R. 1078.

On July 17, 2015, Dr. Guergues administered a bilateral facet injection at L4-5 and L5-S1.   R. 1072.   In the statement of medical necessity for this procedure, Dr. Guergues wrote that Jackson had "suffered from chronic disabling pain" and that it was "medically necessary that the patient undergoes an interventional pain management procedure . . . ."   R. 1074.

On August 24, 2015, Dr. Guergues completed a physical functional assessment form.   He opined that Jackson could sit 30 minutes at a time up to 4 hours in a day.   He could also stand 5 minutes at a time for up to 30 minutes in a day, and he could walk 5 minutes at a time up to 20 minutes in a day.   He could lift and carry up to 5 pounds.   He would have unspecified limitations in bending and pushing or pulling.   R. 1114-15.

On September 8, 2015, an MRI of the lumbar spine revealed very mild degenerative changes with a slight disc bulge at L4-5 and a very mild disc bulge with some neural foraminal narrowing at L5-S1. R. 1201-02.

The spinal cord stimulator was applied on September 14, 2015, and Jackson reported 40% pain relief, but he still rated his pain as 9 on a 10-point pain scale.   R. 1206.   Upon examination, Dr. Malik observed that Jackson had an antalgic gait.   R. 1207.   Dr. Malik indicated that he had exhausted interventional pain management, and he recommended that Jackson consult with a surgeon.   He prescribed Percocet.   R. 1208.   Jackson testified that, thereafter, Dr. Malik refused to continue to prescribe medication to him due to a urinalysis test showing that he was not taking the prescribed medication.   R. 516.

On October 5, 2015, Jackson had a pain management consultation with Shariq Latif, M.D., at Georgia Pain Physicians Palm Coast.   Jackson reported that his pain was at level 10 without medication and at level 5 with medication.   Results of the physical examination were essentially normal but with 4/5 strength in the legs.   Jackson had a normal gait and he was able to stand without difficulty.   The assessment was thoracic spondylosis without myelopathy and numbness and tingling in the hands.   Fentanyl and Percocet were prescribed and further testing was ordered.   R. 1223-27.

On October 19, 2015, an MRI of the thoracic spine revealed disc protrusions at T3-4, T4-5 and T7-8 with some neural foraminal narrowing.   R. 1204.   During a follow-up visit on November 5, 2015, a nurse practitioner in Dr. Latif's practice observed that Jackson had an abnormal gait, walked with a cane and had difficulty standing due to right leg pain.   Jackson's strength was 4/5 in the right leg and 5/5 in the left leg.   R. 1221.

9

NOT FOR PUBLICATION

Dr. Barnes, a board certified orthopedic surgeon (R. 1116), testified about Jackson's physical impairments during the hearing on remand after reviewing the evidence in the record. Dr. Barnes noted that Jackson consistently complained of moderate to severe low back pain.   R. 498-99.   He opined that based on the finding of diminished strength in the legs in the October 2015 examination, Jackson's condition equaled Listing 1.04 due to a lumbar spine impairment. R. 493-95.   He could not testify about how long Jackson's condition would continue to equal that listing.   R. 495.   Dr. Barnes did not agree with Dr. Guergues' functional capacity assessment based on "pretty benign looking physical examinations as far as strength, weakness, [and] sensory changes . . . ."   Dr. Barnes opined that Jackson had the functional capacity to sit 6 to 8 hours a day, an hour or 2 at a time, and stand and walk 2 hours a day, 30 minutes at a time.   He could lift up to 10 pounds occasionally and 5 pounds frequently.   He could occasionally bend, stoop, kneel and walk on stairs or ramps.   He could not climb ropes or ladders. He could occasionally use foot controls.   He should have only occasional exposure to vibrations, hazardous equipment and temperature extremes.   R. 499-500.   He should avoid stress that would elevate his blood pressure.   R. 504.   He testified that Jackson could perform sedentary seated work with lifting of 10 pounds occasionally.   R. 501.   Dr. Barnes noted a few references to use of a cane in the record, R. 498, but he did not state an opinion regarding whether use of a cane was medically necessary.

*Mental Impairments*.

On July 11, 2011, Dr. Merilson examined Jackson at the request of the State Office of Disability Determinations.   She observed that Jackson walked slowly with use of a cane.   R. 366.   Jackson reported that he had problems with emotional adjustment since his injury due to his

physical limitations.   He experienced aggression and anger, sorrow and social isolation with subsequent depression.   R. 365.   He had received no mental health treatment.   R. 366.   After administering some psychological tests, Dr. Merilson's diagnosis was depression disorder, NOS with a global assessment of functioning ("GAF") score of 65.   R. 366-67.

In 2014, Jackson sought treatment at Coastal Mental Health Center.   On May 14, 2014, mental health therapists observed that "Ms. James" appeared flat, sad, downcast, guarded, attentive, minimally communicative, casually groomed and tense with signs of moderate anxiety. The diagnosis was a mood disorder (296.32).   R. 940-41.

On July 12, 2014, an unidentified mental health professional referred Jackson to a hospital for consideration of involuntary hospitalization under the Baker Act.   Upon evaluation, professionals at the hospital determined that Jackson did not require involuntary treatment.   R. 875-77.

On July 24, 2014, Maria Masferrer, M.D., at Coastal Mental Health Center, examined Jackson.   Jackson complained of depression, low energy and difficulty sleeping.   Dr. Masferrer observed that Jackson's attention and concentration, memory, insight and judgment were fair and his anxiety level was 0.   Her diagnosis was moderate depressive disorder ("MDD") recurrent and severe, with a GAF score of 50.   She prescribed individual therapy.   R. 939.

Jackson returned to Coastal Mental Health Center on February 14, 2015, complaining of depression and staying up all night.   A licensed mental health counselor ("LMHC") observed that Jackson was calm, guarded, attentive, well groomed, tense and appeared anxious with a depressed mood.   R. 1180.   The diagnosis was major depressive affective disorder recurrent episode

moderate to severe with a GAF score of 45.   Individual therapy and medication management was recommended.   R. 1180.

Dr. Masferrer examined Jackson again on March 24, 2015.   Jackson complained of angry, verbal outbursts and fatigue.   Dr. Masferrer observed that Jackson was attentive, calm, relaxed, tense and anxious with a depressed mood. She opined that Jackson needed medication management and individual therapy.   His GAF score was 45.   R. 1178, 1181.

Dr. Anderson, a psychologist (R. 1118-19), testified about Jackson's mental impairment at the hearing on remand after reviewing the evidence then in the record.   R. 473.   He opined that Jackson suffered from an adjustment disorder with depression.   He saw no evidence of any severe impact of mental impairment symptoms on Jackson's life.   R. 480-81.   Dr. Anderson did not agree with the diagnoses of major depressive-affective disorder, recurrent episodes, severe degree because he did not see evidence to support that conclusion.   R. 484-85.   He testified that the referral of Jackson for a Baker Act consultation did not change his opinion because, after evaluation at a hospital, it was determined that there was no basis for Jackson to be involuntarily hospitalized.   R. 480, 485-87.

*Vocational Expert Testimony.*

During the hearing after remand, the ALJ asked the VE to assume a hypothetical person of Jackson's age and education with the functional capacity identified by Dr. Barnes.   R. 522-23. The VE testified that this hypothetical person could perform the sedentary, unskilled jobs of table worker; taper, printed circuit board; and loader, semiconductor dies.   R. 523-24.   The VE was not asked whether Jackson could perform these jobs with use of a cane.

12

NOT FOR PUBLICATION

## ANALYSIS.

In the Joint Memorandum, which I have reviewed, counsel for Jackson raises six assignments of error.   He contends that the ALJ erred by failing to give the proper weight to the opinions of Dr. Guergues, a treating physician.   He submits that the ALJ erred by failing to state the weight given to the opinions of Dr. Kollmer and Dr. Malik.   He argues that the ALJ erred in his assessment of the opinions of Dr. Masferrer and the records from Coastal Mental Health Center.   He asserts that the ALJ erred in finding that Jackson's statements about his functional limitations were not entirely credible.   He also argues that the ALJ erred by failing to include his need to use a cane at step five of the sequential analysis.   These are the only issues I will address.

*Opinion of Dr. Guergues.*

Dr. Guergues was one of Jackson's treating physicians.   As such, his opinion "must be given substantial or considerable weight unless 'good cause' is shown to the contrary."   *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004) (quotation omitted). Good cause exists when (1) the treating physician's opinion was not bolstered by the evidence; (2) the evidence supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's medical records.   *Id.* at 1240-41.   The ALJ must articulate the reasons for giving less weight to the opinion of a treating physician.   *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).

Counsel for Jackson contends that the ALJ overlooked Dr. Guergues' July 17, 2015 functional capacity assessment, cited insufficient reasons for giving little weight to his August 2015 assessment, and relied selectively on the record to support her conclusions.

13

As to the first argument, counsel for the Commissioner correctly asserts that Dr. Guergues' July 15, 2015 statement that Jackson suffered from chronic disabling pain was a statement of medical necessity to support the bilateral facet injections he administered rather than a functional capacity assessment.   Dr. Guergues' functional capacity assessment is set forth in the form he completed in August 2015.

The ALJ gave the August 2015 functional capacity assessment little weight, finding that it was conclusory and not supported by Dr. Guergues' treatment notes.   The ALJ is correct that the form Jackson's attorney asked Dr. Guergues to complete is conclusory.   However, there are extensive treatment notes documenting Dr. Guergues' findings regarding Jackson's complaints of pain.   The ALJ cited only two examples of treatment notes in which Dr. Guergues indicated that Jackson's pain was improving and that Jackson appeared in no apparent distress despite findings of severe tenderness in the lumbar spine and moderate limitation in range of motion.   R. 455.   I recommend that the Court find that this selective reading of the record is insufficient to support the ALJ's decision to give Dr. Guergues' functional capacity assessment little weight.

First, Dr. Guergues is a board certified anesthesiologist, and treatment of pain is within his area of expertise.[2]   SSA regulations indicate that more weight is given to the opinion of a specialist about a medical issue related to his area of specialty.   20 C.F.R. § 404.1527(c)(5).   Second, Dr. Guergues had a long treating relationship with Jackson, from 2012 through 2015.   During that time, his treatment notes reflect findings confirming Jackson's complaints of pain, including tenderness on palpation, positive straight-leg raising tests and moderate limitations on

---

[2] ABMS MOC, Certification Matters, *Is Your Doctor Board Certified?*, https://www.certificationmatters.org/is-your-doctor-board-certified/search-now/ln/guergues/fn/youssef.aspx (last visited July 19, 2017).

range of motion.   Third, Dr. Guergues' treatment of Jackson with strong narcotic pain

medications, a variety of procedures intended to relieve pain (facet block injections, rhizotomies,

and a trial of a spinal cord stimulator), and, ultimately recommendation of a surgical consultation,

show that Dr. Guergues credited Jackson's complaints of pain.

In determining whether good cause exists to give little weight to the opinion of Dr.

Guergues, "[a]n ALJ is not free to simply ignore medical evidence, nor may he pick and choose

between the records selecting those portions which support his ultimate conclusion without

articulating specific, well supported reasons for crediting some evidence while discrediting other

evidence."   *Castleberry v. Colvin*, No. 2:13cv411-CSC, 2014 WL 2440943, at *3 (M.D. Ala.

May 30, 2014) (citing *Marbury v. Sullivan*, 957 F.2d 837, 839-41 (11th Cir. 1992) (per curiam)).

Based on the evidence as a whole, I recommend that the Court find that the ALJ's reliance on two

samples from Dr. Guergues' treatment notes is insufficient to provide good cause for giving Dr.

Guergues' functional capacity assessment little weight.

*Opinions of Dr. Kollmer and Dr. Malik.*

In this assignment of error, counsel for Jackson contends that the ALJ erred by failing to

state the weight given to the opinions of Dr. Kollmer and Dr. Malik, both of whom were treating

physicians.   Counsel for the Commissioner concedes that the ALJ did not state the weight given

to the opinions of these physicians.   Doc. No. 19, at 29, 33.   In *Winschel v. Commissioner of*

*Social Security*, 631 F.3d 1176 (11th Cir. 2011), the United States Court of Appeals for the

Eleventh Circuit held that in the absence of a statement of the weight given to different opinions

and the reasons therefor, "'it is impossible for a reviewing court to determine whether the ultimate

decision on the merits of the claim is rational and supported by substantial evidence.'"   *Id.* at

1179 (quoting *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981)).

Counsel for the Commissioner correctly observes that this error may be harmless if a

claimant does not show how the failure to state the weight given to a medical opinion would

likely have changed the outcome of the ALJ's decision.    However, this is not a case in which the

error is harmless because the ALJ did not discuss Dr. Kollmer and Dr. Malik's treatment notes

and implicitly indicate the weight given to these physicians' opinions.   Moreover, in this case the

Appeals Council explicitly directed the ALJ to state the weight given to all opinions "and explain

the weight given to such opinion evidence."  R. 555-56.   Violation of the Appeals Council's

order is reversible error.   "[W]henever the Appeals Council returns a case to an ALJ, whether

originally remanded by a court or Council, the ALJ is required to follow 20 C.F.R. § 404.977(b),"

and the failure to do so is reversible error.  *Warren-Ward v. Astrue*, No. 1:07cv811-TFM, 2008

WL 2397390, at *2-3 (M.D. Ala. June 10, 2008).

Under these circumstances, I recommend that the Court find that the failure to discuss the

opinions of Dr. Kollmer and Dr. Malik and state with particularity the weight given to these

opinions and the reasons therefor is reversible error.

*Opinions of Dr. Masferrer.*

Counsel for Jackson also argues that the ALJ erred in giving little weight to the opinions

of Coastal Mental Health Center, which included the opinions of Dr. Masferrer.   He contends

that it appears that the records from Coastal Mental Health Center were incomplete, thus

undermining the ALJ's finding that Dr. Masferrer made essentially two one-time assessments

rather than providing a course of consistent treatment.   R. 449.   However, counsel for Jackson

16

did not provide additional treatment records from Dr. Masferrer or Coastal Mental Health Center. Therefore, I recommend that the Court find that assignment of error is not meritorious because it is based on pure speculation.

*Use of a Cane.*

Counsel for Jackson asserts that the ALJ erred in her finding that a cane was not medically necessary at all times based on two treatment notes in which Jackson was observed to have a normal gait and station.   R. 454.   The ALJ also found that "as a younger individual the cane would only be necessary to ambulate to work, therefore, sedentary work would not be restricted by use of a cane."   *Id.*   Counsel for the Commissioner concedes, "It is not clear what the basis is for the ALJ's statement that, as a younger individual, Plaintiff's cane would only be necessary to ambulate to work."   Doc. No. 19, at 39.

The record contains medical evidence from Dr. Parnell stating that use of a cane was medically necessary and that Jackson should carry it at all times.   R. 1021.   This is the medical documentation necessary to support a finding that a hand-held assistive device was medically required.   SSR 96-9P, 1996 WL 374185, at *7.   Counsel for the Commissioner attempts to supplement the ALJ's reasoning that the cane was not medically required by citing to additional evidence in the record that Jackson was, at times, able to walk without use of a cane.   Doc. No. 19, at 39.   The Court must consider the reasons provide by the ALJ not after-the-fact support for those conclusions offered by the Commissioner's counsel.   *See, e.g., Baker v. Comm'r of Soc. Sec.*, 384 F. App'x 893, 896 (11th Cir. 2010) (cited as persuasive authority).   Finally, Dr. Barnes, one of the medical experts, did not render an opinion regarding whether the cane was medically necessary.

Counsel for the Commissioner also asserts that SSR 96-9 contemplates that use of a cane does not necessarily preclude an individual from performing sedentary work.   Doc. No. 19, at 40. While that is correct, SSR 96-9p further provides that the ALJ must always consider the particular facts of a case regarding whether the need for a cane would limit sedentary work, and the Ruling notes that the testimony of a VE may assist in making this determination.   SSR 96-9p, 1996 WL 374185, at *7.   Because the ALJ's RFC assessment contemplates jobs that require standing and walking up to 2 hours total, vocational expert testimony would be required to determine whether there were jobs within the RFC that Jackson could perform with use of the cane.

For these reasons, I recommend that the Court find that this assignment of error is well taken.

*Credibility.*

In the last assignment of error, counsel for Jackson argues that the ALJ did not articulate specific and adequate reasons to support the determination that Jackson's reports of his functional limitations were not entirely credible.   If an ALJ decides not to credit a claimant's testimony as to pain and other subjective symptoms, he must articulate explicit and adequate reasons for doing so.   *Foote v. Chater*, 67 F.3d 1553, 1561-62 (11th Cir. 1995).

Counsel for Jackson argues that the ALJ cited only three reasons to support the credibility finding.   Doc. No. 19, at 41-42.   Counsel for the Commissioner correctly asserts that the ALJ indicated that she considered all of the available evidence, including statements made by Jackson to treating physicians.   R. 454.   The ALJ discussed much of this evidence throughout the decision.   The ALJ also indicated that she considered that Jackson was released from one pain management clinic for "wrong drugs in his urine," and subsequently sought treatment from

18

another facility.   *Id.*   Jackson's testimony about being released from Dr. Malik's practice and seeking treatment at Georgia Pain Physicians Palm Coast supports this finding.[3]

Additionally, counsel for Jackson faults the ALJ for relying on Jackson's testimony that he received unemployment compensation after the alleged disability onset date.   R. 455.   The ALJ did not err in considering the receipt of unemployment benefits as part of the credibility analysis.   *Boyd v. Astrue*, No. 3:10-cv-105-J-JRK, 2011 WL 1259795, at *6-7 (M.D. Fla. March 31, 2011).

Because the ALJ articulated specific and adequate reasons supported by substantial evidence in the record for her credibility finding, I recommend that the Court find that the last assignment of error is unavailing.

*Proceedings on Remand.*

Because of the errors in the ALJ's decision discussed above, I recommend that the Court find that the final decision of the Commissioner should be reversed.   Counsel for Jackson asks that, due to the delay in adjudication of Jackson's applications for benefits, the case be remanded with instructions to the SSA to award him benefits.

Remand for an award of benefits is appropriate only when "the [Commissioner] has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt." *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993). In this case, the Commissioner has not yet properly considered the essential evidence of record and it is not evident that Jackson is disabled without any doubt.   Therefore, I recommend that the

---

[3] That the ALJ mistakenly indicated that Georgia Pain Physicians Palm Coast was located in Georgia, rather than in Florida, does not undermine her analysis.

Court find that remand for an award of benefits is not appropriate. However, the Court may, in its discretion, require the Commissioner to provide periodic status reports and/or limit the time within which proceedings on remand must be concluded.   *See, e.g., Bond v. Comm'r of Soc. Sec.*, No. 6:13-cv-175-Orl-36DAB, 2014 WL 12618197, at *3 (M.D. Fla. Jan. 27, 2014).

Should the Court remand the case for further proceedings, I further recommend that the ALJ on remand not adopt findings made in earlier decisions, even if the Court has found such findings not to be reversible error, because the ALJ on remand will be considering additional evidence that may undermine the previous determinations.     When an ALJ adopts statements made in previous, reversed or vacated decisions, it is difficult to avoid having the errors in previous decisions carried over to the new decision. *See, e.g., McClaney v. Astrue*, No. 10-cv-5421 (JG)(JO), 2012 WL 3777413, at *20 (E.D.N.Y. Aug. 10, 2012) (recommending that the court remand the case with instructions to the SSA to reassign the case to another ALJ for a fresh look), *report and recommendation adopted*, No. 10-cv-5421 (E.D.N.Y. Aug. 30, 2012).

## RECOMMENDATIONS.

For the reasons discussed above, I **RESPECTFULLY RECOMMEND** that the Court **REVERSE** the final decision of the Commissioner pursuant to sentence four of § 405(g) and **REMAND** the case for further proceedings.   I further **RECOMMEND** that the Court direct the Clerk of Court to issue a judgment consistent with its ruling on this Report and Recommendation and, thereafter, to close the file.

Failure to file written objections to the proposed findings and recommendations contained in this Report and Recommendation within fourteen (14) days from the date of its filing shall bar

20

NOT FOR PUBLICATION

an aggrieved party from challenging on appeal the district court's order based on unobjected-to

factual and legal conclusions.

**RESPECTFULLY RECOMMENDED** this 20th day of July, 2017.

*Karla R. Spaulding*

KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE